## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARIA LEE, Derivatively on Behalf of FORTERRA, INC., <br><br> Plaintiff, <br><br> v. <br><br> JEFFREY K. BRADLEY, W. MATTHEW BROWN, LORI M. BROWNE, WILLIAM KERFIN, KYLE S. VOLLUZ, KEVIN BARNER, ROBERT CORCORAN, SAMUEL D. LOUGHLIN, CLINT McDONNOUGH, JOHN McPHERSON, CHRIS MEYER, JACQUES SARRAZIN, CHADWICK S. SUSS, and GRANT WILBECK, <br><br> Defendants, <br><br> -and- <br><br> FORTERRA, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No.:_____ <br><br><br> **JURY TRIAL DEMANDED** |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Maria Lee ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Forterra, Inc. ("Forterra" or the "Company"), submits this Verified Stockholder Derivative Complaint against Jeffrey K. Bradley ("Bradley"), W. Matthew Brown ("Brown"), Lori M. Browne ("Browne"), William Kerfin ("Kerfin"), Kyle S. Volluz ("Volluz"), Kevin Barner ("Barner"), Robert Corcoran ("Corcoran"), Samuel D. Loughlin ("Loughlin"), Clint McDonnough ("McDonnough"), John McPherson ("McPherson"), Chris Meyer ("Meyer"), Jacques Sarrazin ("Sarrazin"), Chadwick S. Suss ("Suss"), and Grant Wilbeck ("Wilbeck" and, collectively, the "Individual Defendants"), for breaches of their fiduciary duties, constructive

fraud, unjust enrichment, corporate waste, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and United States Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.   Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based on the investigation conducted by her attorneys.   This investigation included, among other things, a review of the Company's announcements and press releases, filings made by the Company with the SEC, corporate governance documents available on the Company's website, securities analysts' reports about Forterra, and news reports and other publicly available information about the Company.

## NATURE OF THE ACTION

1.      This stockholder derivative action arises from the Individual Defendants' breaches of fiduciary duties owed to the Company, as well as their complicity in constructive fraud, corporate waste, unjust enrichment, and violations of the Exchange Act, beginning in December 2016 and continuing through August 2017 (the "Relevant Period").

2.      Forterra is the name given to a group of building products companies after their acquisition by the private equity firm, Lone Star Fund IX (U.S.), L.P. (along with its related entities, "Lone Star").   The Company, which manufactures and sells pipe and precast products in the United States and Canada, was acquired on March 13, 2015 from the German cement company, HeidelbergCement AG ("HeidelbergCement"), in a highly leveraged buyout.

3.      The Individual Defendants caused the Company to carry out six costly transactions in the year following its acquisition, and within fifteen months Forterra's debt had ballooned to a staggering $1.2 billion.

4.      The Company continued its acquisition spree through October 14, 2016.  On October 21, 2016, Forterra conducted an initial public stock offering (the "IPO") in which the Company offered 18,420,000 shares at a price of $18.00 per share.

5.      In the Company's IPO prospectus and in subsequent filings with the SEC, the Individual Defendants caused Forterra to deceptively claim that it had effective strategies in place to produce organic growth.  In fact, the Company did not experience any organic growth during the Relevant Period as the result of ineffective growth initiatives, increased pricing pressures, operational problems at its plants, and rising bad debt expenses.

6.      Throughout the Relevant Period, the Individual Defendants shirked their fiduciary duties to the Company by failing to ensure that there were effective internal controls in place to integrate the numerous acquisitions that Forterra carried out immediately preceding its IPO.  As a result of the Company's ineffective internal controls, fraudulent accounting related to improper recognition of inventory and the associated inaccurate booking of revenue were allowed to take place within at least one of Forterra's newly-acquired companies.

7.      The Individual Defendants were essentially operating as surrogates for Lone Star, and in that role, they allowed the debt-saddled Company to make public statements that misleadingly suggested Forterra was financially sound and in a position to grow organically. Throughout the Relevant Period, the Individual Defendants caused Forterra to issue materially false and misleading financial reports, to file such statements with the SEC, and facilitated this false financial reporting by allowing the Company to operate without effective internal controls.

8.      Similarly, the Forterra Board of Directors (the "Board") was nothing more than a proxy for Lone Star, and its members repeatedly exhibited their lack of concern for the well-being of the Company and its stockholders throughout the Relevant Period by, *inter alia*:  (i) soliciting

stockholder votes based on inaccurate and/or misleading information in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9; (ii) exposing the Company to millions of dollars in potential liability; and (iii) causing Forterra to pay more than $1 million in improper severance payments to their colleague, defendant Brown, by determining that he should be allowed to resign "for good reason."

9.     As a result of the Individual Defendants' misconduct described herein, the Company has been subjected to a related securities class action.  In addition, the Individual Defendants' actions have resulted in the Company being named as a defendant in a federal whistleblower lawsuit.  The whistleblower lawsuit will not only severely frustrate the Company's ability to effectively defend itself in the other lawsuits currently pending against Forterra, it may also result in the Company incurring significant punitive and reputational damages.

10.     Forterra has been substantially damaged as a result of the Individual Defendants' breaches of their fiduciary duties and other misconduct.  This action seeks redress on behalf of the Company for the wrongdoing alleged herein.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court also has subject matter over the claims asserted herein pursuant to 28 U.S.C. § 1332 as plaintiff is a citizen of a different state than all the defendants and the matter in controversy exceeds $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over nominal defendant Forterra because it is authorized to do business in this state, has consented to service in this state, and is incorporated within this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Forterra occurred in this District, and/or defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.     Plaintiff is a current stockholder of Forterra common stock and has continuously held Forterra common stock since January 9, 2017. Thus, Plaintiff was a stockholder at the time of the transactions complained of herein. Plaintiff is a citizen of California.

### Nominal Defendant Forterra

15.     Nominal Defendant Forterra is a Delaware corporation with its principal executive offices located at 511 East John Carpenter Freeway, Irving, Texas, 75062. Forterra stock trades on NASDAQ under the ticker symbol "FRTA."

### The Individual Defendants

16.     Defendant Bradley has been the Chief Executive Officer ("CEO") of Forterra since September 2015 and a director of Forterra since July 2016. In 2016, Bradley received total compensation of $3,140,119 and an actual bonus payout of $1,222,656. In 2017, Bradley received $2,829,533 in compensation and an actual bonus payout of $111,375. Bradley is a citizen of Texas.

17.     Defendant Brown was the Chief Financial Officer ("CFO") of Forterra between August 2015 and September 6, 2017, when he was permitted to resign.  Brown was also an Executive Vice President of the Company between April 2016 and September 6, 2017.  In 2016 and 2017, Brown received total compensation of $1,316,363 and $1,124,421, respectively.  In 2016, Brown received an actual bonus payout of $585,856.  In 2017, Brown received an actual bonus payout of $92,096 pursuant to his separation agreement.  Brown is a citizen of Texas.

18.     Defendant Browne has been an Executive Vice President and the General Counsel of Forterra since December 2017.  From June 2016 through December 2017, Browne served as Forterra's Senior Vice President and General Counsel, and from March 2015 to June 2016 she served as Forterra's Vice President and General Counsel.  In 2016 and 2017, Browne received total compensation of $805,069 and $866,435, respectively.  In 2016 and 2017, Browne received an actual bonus payout of $207,948 and $244,125, respectively.  Browne is a citizen of Texas.

19.     Defendant Kerfin has been the President of Forterra Water Pipe & Products since April 2016.  Kerfin previously served as Vice President of Sales for U.S. Pipe, which was acquired by Forterra on or about April 15, 2016.  In 2016 and 2017, Kerfin received total compensation of $777,511 and $990,718, respectively.  In 2016 and 2017, Kerfin received an actual bonus payout of $277,258 and $225,356, respectively.  Kerfin is a citizen of Illinois.

20.     Defendant Volluz was a member of the Board between June 21, 2016 until he resigned on September 25, 2018.  Volluz joined Hudson Advisors L.P. ("Hudson"), an affiliate of both Forterra and Lone Star, in 2009.  Volluz has been the managing director of Hudson since January 2015.  Before joining Hudson, Volluz was a Senior Vice President and Director of Legal Services for Goldman Sachs Specialty Lending Group from 2005 to 2009.  In that position, Volluz

was responsible for oversight of various legal issues that impacted affiliates of both Lone Star and Hudson.  Volluz is a citizen of Texas.

21.     Defendant Barner was a member of the Board from October 2016 until his resignation in March 2018.  Barner has been a managing director of Lone Star North America Acquisitions LLC ("Lone Start North America"), an affiliate of Forterra and Lone Star, since December 2016 and was a director of Lone Star from June 2014 through December 2016.  In his position with Lone Star, he focused on origination and underwriting activities related to corporate private equity and debt investments throughout the Americas.  From August 2012 until June 2014, Barner was a Vice President at Hudson.  Barner is a citizen of Texas.

22.     Defendant Corcoran has been a member of the Board since October 2016.  Since January 2016, Corcoran has been a Senior Advisor – Global Operations for Hudson.  Corcoran also served as President and Chief Operating Officer ("COO") of Hudson from July 2014 to December 2015.  He was also the President and CFO of Hudson.  Corcoran is a citizen of Texas.

23.     Defendant Loughlin was a member and Chairman of the Board between October 2016 and his resignation in July 2017.  Loughlin was also the President of Lone Star North America, where he was responsible for the management and oversight of all origination initiatives in North America.  From 2011 to 2013, he was a managing director and senior managing director of Lone Star.  Loughlin joined Hudson in 2008, and from 2008 until 2011, he served in various capacities at Hudson.  Loughlin is a citizen of Texas.

24.     Defendant McDonnough has been a member of the Board since October 2016.  McDonnough has also been a member of Forterra's Advisory Board since July 1, 2015.  Before retiring in June 2015, McDonnough was an audit partner at Ernst & Young LLP ("E&Y") for thirty-eight years.  The Dallas office of E&Y is and has been Forterra's outside auditing firm since

prior to its IPO.  In 2016, McDonnough received total compensation of $125,185, including $23,125 of fees earned or paid in cash.  In 2017, McDonnough received total compensation of $142,688, including $84,348 of fees earned or paid in cash.  McDonnough is a citizen of Texas.

25.     Defendant McPherson has been a member of the Board since October 2016. Between 1995 and October 2011, McPherson worked with Meyer at McKinsey & Company, Inc. ("McKinsey"), a global management consulting firm, most recently serving as its senior partner from 2006 to 2011.  In 2016, McPherson received total compensation of $119,294, including $20,000 of fees earned or paid in cash.  In 2017, McPherson received total compensation of $138,014, including $79,674 of fess earned or paid in cash.  McPherson is a citizen of Texas.

26.     Defendant Meyer has been a member of the Board since October 2016 and Chairman of the Board since July 2017.  Meyer has also served as a managing director of Hudson since February 2015.  In that capacity, Meyer has oversight responsibility for a number of Lone Star's private equity investments, including Forterra, and also assists with due diligence and underwriting of potential operating company investments.  Prior to joining Hudson in February 2015, Meyer was a director at McKinsey where he worked with McPherson.  Meyer is a citizen of Texas.

27.     Defendant Sarrazin has been a member of the Board since October 2016.  In 2016, Sarrazin received total compensation of $98,579, including $16,250 of fees earned or paid in cash. In 2017, Sarrazin received total compensation of $123,340, including $65,000 of fees earned or paid in cash.  Sarrazin is a citizen of France.

28.     Defendant Suss was a member of the Board between October 2016 and his resignation in April 2018.  Suss was also a director and Vice President of Hudson.  Suss is a citizen of Illinois.

29.     Defendant Wilbeck was a member of the Board between October 2016 and his resignation in March 2018.  Wilbeck was the senior managing director of Lone Star North America between 2013 and December 2016.  In that position, Wilbeck focused on origination and underwriting activities related to corporate private equity and debt investments.  Wilbeck is a citizen of Texas.

30.     Defendants Bradley, Brown, Browne, and Kerfin are collectively referred to as the "Officer Defendants."

31.     The Individual Defendants participated in the issuance and preparation of materially false and/or misleading statements by Forterra, including press releases and SEC filings. Because of the Individual Defendants' positions with Forterra, they were aware of the adverse material non-public information about the business of Forterra, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers and/or directors of Forterra, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each officer and director owe to the Company and its stockholders the fiduciary duty to exercise good faith and

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

34.     As senior executive officers, directors, and/or controlling stockholders of a publicly-traded company, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Forterra's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

35.     To discharge their duties, the officers and directors of Forterra were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Forterra were required to, among other things:

        a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

        b.      conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        c.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.      ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

36.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

37.     In addition, Forterra maintains a Code of Ethics and Business Conduct (the "Code of Ethics"), pursuant to which the Individual Defendants were required to "conduct Company business adhering to both the letter and the spirit of this Code and all applicable laws, rules, and regulations in all cities, states, and countries in which the Company operates."

38.     The Code of Ethics explicitly requires that the Individual Defendants ensure that the Company's financial information is accurately reported.  Specifically, the Code of Ethics states:

Employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to the applicable supervisors and officers of significant transactions and the people involved, trends and other financial or non-financial information that may be material to the Company. Employees are also responsible for timely reports of other information not necessarily of a financial nature that could have a significant impact on the Company's business, financial condition or results of operations. Reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") or the NASDAQ Global Select Market ("NASDAQ"), and other public communications, must contain full, fair, accurate, timely and understandable disclosure. If any employee becomes aware of any material misstatement or omission in the Company's filings or other public communications, the employee must contact the Designated Officer.

39.     Forterra's senior financial officers were required to accurately and reliably prepare the Company's financial records.  The Code of Ethics clearly delineates this duty:

Senior financial officers are responsible for the accurate and reliable preparation and maintenance of the Company's financial records. Accurate and reliable preparation of financial records is critically important to proper management decisions and the fulfillment of the Company's financial, legal and reporting obligations.  Diligence in accurately preparing and maintaining the Company's records allows the Company to fulfill its reporting obligations and provide stockholders, governmental authorities and the general public with full, fair, accurate, timely and understandable disclosure. Senior financial officers are responsible for establishing and maintaining adequate disclosure controls and procedures and internal controls and procedures, including procedures designed to accurately document and account for transactions on the Company's books and records, and for maintaining reports, vouchers, bills, invoices, payroll and service records, business measurement and performance records and other essential data with care and honesty.

40.     The Individual Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their own company's Code of Ethics, has inflicted, and will continue to inflict, significant harm on Forterra, as detailed herein.

## SUBSTANTIVE ALLEGATIONS

*Factual Background*

41.     Lone Star is a private equity group founded in 1995 that invests primarily in distressed assets in the United States, Canada, and internationally.  Lone Star currently has seventeen investment funds and manages approximately $70 billion in investor capital.

42.     In late 2014, Lone Star entered into an agreement with HeidelbergCement to purchase Hanson Building Products ("Hanson") for $1.4 billion in a highly leveraged buyout.[1] Before selling Hanson to Lone Star, HeidelbergCement had previously pursued an IPO of the company in an effort to reduce its debt.  The transaction closed in March 2015.

43.     The group of businesses that comprised Forterra was operated as a wholly owned subsidiary of Lone Star by controlling stockholder LSF9 Concrete Holdings, Ltd. ("Concrete Holdings").  In February 2016, Lone Star changed Concrete Holdings' name to Forterra.

44.     Today, Forterra manufactures pipe and precast products in the United States and Canada.  The Company has two reporting segments:  Drainage Pipe and Water Pipe.  Its products are used primarily for water-related infrastructure projects, such as water transmission, distribution, and drainage.  The Company's components are used in both residential and non-residential projects

45.     After acquiring the Company, Lone Star caused Forterra to make a series of six significant acquisitions between April 2015 and October 2016, thereby increasing Forterra's long-term debt significantly.  The acquisitions included the following:  (i) U.S. Pipe for $775 million in April 2015; (ii) Cretex Concrete Products, Inc. for $245 million in October 2015; (iii) Sherman-Dixie Concrete Industries, Inc. for $67 million in January 2016; (iv) Bio Clean Environmental

---

[1]  Forterra was previously known as Hanson.

Services, Inc. and Modular Wetland Systems, Inc. for $30 million in August 2016; (v) J&G Concrete Operations LLC for $32 million in October 2016; and (vi) Precast Concepts LLC for $97.1 million in October 2016.

46.     By June 2016, as a result of the acquisitions, the Company had approximately $1.2 billion in long-term debt – more than triple the amount it carried, as Hanson, two years earlier.[2] The Company's debt levels were also significantly higher than those of its peers: as of June 30, 2016, Forterra's long-term debt to EBITDA ratio was 6.62, as compared with Ibstock plc's ratio of 1.35 and Boral Ltd.'s ratio of 2.09.

47.     Consequently, when Lone Star announced its plan to take Forterra public, analysts and industry specialists expressed concern.  For example, as noted by an October 2016 article by Private Equity Closer Look entitled "Shaky Foundations at Forterra: Lone Star Funds' foray into the building materials industry," under the proposed IPO, outside investors would have very limited say in the direction of Forterra – Lone Star would still own 71% of the Company's stock, effectively controlling all matters submitted to stockholders for approval, even director elections. An October 19, 2016 article published by The Motley Fool, "What Investors Need to Know About the Forterra IPO," cautioned investors about Forterra's high level of indebtedness, stating that servicing the debt that the Company had on its books would cost the Company upwards of $73 million per year in 2016, and more than $112 million per year from 2017 onwards.

48.     An analysis of Forterra's IPO by Donovan Jones ("Jones"), published by *Seeking Alpha* on October 11, 2016, also cautioned investors about the Company's unproven ability to organically grow revenues.  According to Jones, "sales growth, once the acquisitions have come

---

[2]  As of September 30, 2014, Hanson had only $343,182 in long-term debt, and only $342,589 in total liabilities, compared with Forterra's $1,830,643 in total liabilities as of June 30, 2016.

to an end, will need to be entirely organic in nature, and the company has not yet proven itself as to its ability to grow organically."

49.     Nevertheless, the Company still had potential for growth – at the time of its IPO, Forterra was the largest producer of drainage and water transmission pipe goods in the publicly-traded sphere and industry experts estimated that the market in which Forterra operates would grow from $12.5 billion to over $18 billion in 2018.  An additional increase in market opportunity was provided by the December 2015 enactment of the Fixing America's Surface Transportation Act ("FAST Act"), which authorized $305 billion of funding over five years to upgrade transportation-related infrastructure.  The FAST Act could have positively impacted the Company's Drainage Pipe and Products segment, which is a function of new highway and highway improvement projects.

50.     Before the IPO, Concrete Holdings distributed the brick segment of Forterra to another affiliate of Lone Star.  In October 2016, in a corporate reorganization transaction, ownership of the remaining businesses of Forterra Building Products was transferred to Forterra, a wholly-owned subsidiary of Forterra US Holdings, LLC, which is indirectly wholly-owned by an affiliate of Lone Star.

51.     On October 21, 2016, Lone Star took Forterra public.  The Company sold 18.42 million shares of Forterra common stock at $18 per share, raising approximately $331.56 million in gross proceeds.

***Forterra's Lack of Adequate Internal Controls and Resulting False Financial Reporting***

52.     Analysts' pre-IPO warnings regarding Forterra's indebtedness and ability to generate organic growth soon proved to be prescient.  Beginning as early as December 2016, the Individual Defendants caused the Company to operate with materially defective internal and

reporting controls.  The lack of internal controls impeded Forterra's ability to accurately calculate and disseminate its financial results.

53.     On November 15, 2016, the Individual Defendants caused Forterra to file a quarterly report with the SEC on form 10-Q.  The Form 10-Q falsely stated that the CEO and CFO had determined that Forterra's disclosure controls and procedures were effective as of September 30, 2016.  The Form 10-Q also noted material weaknesses identified as of December 31, 2015, including weaknesses related to control deficiencies in the Company's inventory cycle.

54.     On March 29, 2017, the Individual Defendants caused Forterra to issue a press release announcing the Company's fourth quarter and full year 2016 financial results.  According to the press release Forterra's: (i) net sales for fourth quarter 2016 increased to $354.1 million; (ii) gross margin expanded to 17.0%; (iii) net sales for FY16 increased to $1,364.0 million; and (iv) gross margin for FY16 expanded to 20.6%.  The press release was overwhelmingly optimistic, quoting Bradley as stating:

> We are pleased with the significant accomplishments we made in 2016 that laid the foundation for further growth and margin expansion.  Accretive acquisitions expanded our geographic scope, increased our market share in key growth regions, enhanced the breadth of our product offerings, added an innovative and fast-growing stormwater treatment product line and enhanced our position as a market leader in water and drainage infrastructure pipe and products.  The early results of our initiatives to drive margin expansion and lower costs are reflected in our results for the year.

> Forterra is better positioned today to benefit from a favorable outlook across all three of our end markets than any time in the past.  Our focus in 2017 is to execute on multiple initiatives that we expect to drive top-line growth, expand our margins and lower our costs.

55.     Bradley's language gave the distinct impression that the Company's recent acquisitions, rather than merely providing a rapid influx of short-term revenue, had laid a strong foundation for the Company which would allow it to reliably expand in each of its markets.

56.     On March 31, 2017, Forterra filed an annual report on Form 10-K with the SEC (the "FY16 Form 10-K"). The FY16 Form 10-K was signed by defendants Bradley, Brown, Barner, Corcoran, Loughlin, McDonnough, McPherson, Meyer, Sarrazin, Suss, Volluz, and Wilbeck. The FY16 Form 10- K was also certified by Bradley and Brown as complying with Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX").

57.     The FY16 Form 10- K stated that Forterra's "disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2016," but attempted to qualify the admission by claiming that the control defects related exclusively to inventory and bill and hold arrangements. Specifically, the FY16 Form 10-K stated that management had identified a:

> [m]aterial weakness related to the aggregation of control deficiencies relating to inventory, including control deficiencies related to physical inventory counts, the evaluation of reserves for excess inventories, the periodic review of manufacturing labor and overhead variances, and standard cost procedures [and a] [m]aterial weakness related to control deficiencies relating to bill and hold revenue transactions, including control deficiencies related to procedures to identify all bill and hold arrangements and sufficiently evaluate the accounting criteria prior to revenue recognition.

58.     Significantly, the FY16 Form 10-K also disclosed that the Company had not effectively integrated the accounting and financial reporting systems of three of its acquired businesses – Cretex, Sherman-Dixie, and U.S. Pipe – and was still evaluating whether and to what extent the Company planned to do so in the future. In addition to Forterra's own issues with integration, the FY16 Form 10-K disclosed that U.S. Pipe had recently acquired other businesses before being acquired by Forterra and that the integration of those businesses remained ongoing.

59.     The FY16 Form 10-K identified a number of serious problems that could occur as a result of Forterra's continued failure to successfully integrate its new acquisitions, including:

a.      diversion of the attention of our management and that of the acquired business;

b.      combining management teams, strategies and philosophies;

c.      merging or linking different accounting and financial reporting systems and systems of internal controls;

d.      assimilation of personnel, human resources and other administrative departments and potentially contrasting corporate cultures;

e.      merging computer, technology and other information networks and systems;

f.      incurring or guaranteeing additional indebtedness;

g.      disruption of our relationship with, or loss of, key customers, suppliers or personnel;

h.      interference with, or loss of momentum in, our ongoing business or that of the acquired company; and

i.      delays or cost overruns in the integration process.

60.     Despite the Company's admitted internal control deficiencies, the Individual Defendants assured investors that Forterra's 4Q16 and FY16 financial results were accurate and complied with GAAP, stating:

> In light of these material weaknesses, we performed additional analyses and other procedures to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with US GAAP. These measures included, among other things, expansion of our year-end closing and consolidation procedures, and implementation of additional analytical reviews and verification procedures. As a result, we have concluded that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with U.S. GAAP.

61.     Finally, the FY16 Form 10-K failed to explain how the Company's disclosure controls and procedures had suddenly become ineffective in the two months between September 31, 2016 and December 31, 2016.

62.     On May 15, 2017, Forterra filed its first quarter report on Form 10-Q with the SEC (the "1Q17 Form 10-Q"). The 1Q17 Form 10-Q again stated that Bradley and Brown determined that Forterra's "disclosure controls and procedures were not effective at the reasonable assurance

level as of March 31, 2017" because of "material weaknesses." The 1Q17 Form 10-Q disclosed

that the material weaknesses in internal control over financial reporting, identified by management

as of December 31, 2016, remained unremediated as of March 31, 2017.

63.     In addition to the two material weaknesses identified in the FY16 Form 10-K, the

1Q17 Form 10-Q disclosed a third material weakness:

> A material weakness related to the design and operating effectiveness of controls
> related to the accounting for cost accruals, including control deficiencies related to
> the Company's lack of timely identification and processing of invoices during the
> financial statement close process to ensure cost accruals are complete. In the current
> quarter, the Company identified and corrected prior period errors related to cost
> accrual items which should have been recognized in 2016. These errors were
> primarily caused by insufficient coordination and communication between the
> Company's plant and corporate office locations. A cumulative correction was
> recorded during the quarter ended March 31, 2017 which increased pretax loss by
> $4.6 million, of which $3.3 million increased cost of revenues and $2.0 million
> increased selling, general and administrative expenses, partially offset by a
> $0.7 million increase in revenues.

64.     Once again, the Company claimed that despite the admitted, persistent weaknesses

in Forterra's internal controls, the 1Q17 financial results were accurate and had been prepared in

accordance with GAAP.

65.     However, the results presented in the 1Q17 Form 10-Q revealed that the Company

had performed poorly and had not achieved any organic growth during the quarter. While

Forterra's first quarter sales nearly doubled year over year to $338.3 million, all of the Company's

sales growth came from acquisitions. Even with the acquisition-driven sales, the Company's

numbers failed to meet analysts' consensus of $338.6 million. Forterra also reported a

consolidated net loss of $22.5 million or $0.31 per share in 1Q17, which was significantly worse

than analysts' predictions of $0.09.

66.     The market reacted accordingly: by May 16, 2017, Forterra's stock had declined

more than 34 percent. Analysts from Citi, Barclays, SunTrust, and RBC Capital all downgraded

Forterra on May 16, 2017.  RBC Capital's target price was lowest at $16, down from $23, and *SeekingAlpha* reported that in downgrading Forterra, RBC Capital stated that "management's credibility has been compromised and investors should move to the sidelines until [Forterra] can string together a few quarters of consistent financial performance."

67.     On July 27, 2017, Loughlin announced his resignation as Chairman of the Board, concurrent with his resignation from Lone Star.  Meyer was appointed Chairman of the Board that same day.

68.     On August 10, 2017, Forterra filed its second quarter financial report on Form 10-Q with the SEC.  Once again, the Company admitted that it had still not generated any organic growth and that its sales growth continued to be exclusively acquisition-generated.  Furthermore, the Company revealed that it had insufficient disclosure controls as of June 30, 2017 as a result of unremediated material weaknesses.  Although the Individual Defendants were aware of material weaknesses in the Company's internal controls for over a year, they persistently failed to take any remedial action.  As a result, as of June 30, 2017, Forterra continued to experience the following material weaknesses with respect to the following:

a.     The design and operating effectiveness of inventory controls was identified, including the aggregation of control deficiencies related to physical inventory counts, the evaluation of reserves for excess inventories, the periodic review of manufacturing labor and overhead variances, and standard cost procedures;

b.     The design and operating effectiveness of controls over bill and hold revenue transactions was identified, including control deficiencies related to procedures to identify all bill and hold arrangements and sufficiently evaluate the accounting criteria prior to revenue recognition; and

c.     The design and operating effectiveness of controls related to the accounting for cost accruals, including control deficiencies related to our lack of timely identification and processing of invoices during the financial statement close process to ensure cost accruals are complete.  In the quarter ended March 31, 2017, we identified and corrected prior period errors related to cost accrual items which should have been recognized in 2016.  These errors

were primarily caused by insufficient coordination and communication between our plant and corporate office locations. A cumulative correction was recorded during the quarter ended March 31, 2017 which increased pretax loss by $4.6 million, of which $3.3 million increased cost of goods sold and $2.0 million increased selling, general and administrative expenses, partially offset by a $0.7 million increase in revenues.

69.     On September 7, 2017, Forterra announced that Brown had resigned as CFO on September 6, 2017, effective immediately. Although the Individual Defendants did not provide an explanation for Brown's resignation, they determined that it would be treated as "a resignation for good reason," as opposed to a resignation "for cause." This distinction was vital, as a resignation "for cause" would have deprived Brown of any severance benefits. The Board awarded Brown a severance payment in excess of $1 million, which included a continuation of his base salary, a pro-rated annual bonus for 2017, health care coverage, and other benefits.

70.     On November 9, 2017, Forterra filed its third quarter financial report on Form 10-Q with the SEC. Once again, the Company admitted that it had still not generated any organic growth and that its sales growth continued to be exclusively acquisition-generated. Furthermore, the Company revealed that it continued to have insufficient disclosure controls as of September 30, 2017 as a result of the same unremediated material weaknesses.

71.     When Forterra filed its annual report for 2017 on Form 10-K, on March 7, 2018, the Individual Defendants again revealed that the Company's internal controls contained material defects. Specifically, management identified the following two material weaknesses as of December 31, 2017:

a.      A material weakness related to the aggregation of control deficiencies over the inventory process, primarily related to the ineffective design and operating effectiveness of controls over physical inventory counts, processes to validate inputs used in the calculation of excess and obsolete inventory reserves, and control activities related to the periodic review of standard cost variances and related adjustments of inventories to actual costs.

b.      A material weakness related to the aggregation of control deficiencies over the revenue recognition process, primarily related to the ineffective design and operating effectiveness of controls over the verification of physical shipments and internal validation of customer approvals of sales order terms prior to recognizing revenue.

72.      Once again, the Individual Defendants caused Forterra to claim that the weakness would be addressed by various remediation plans.

73.      Forterra's Form 10-K for 2017 also disclosed that the Company's acquisitions had not yet been integrated.  Specifically, Forterra had not fully integrated the accounting and financial reporting systems of the acquired businesses, and according to the Form 10-K, management had not decided if they planned to do so in the future.  At all times during the Relevant Period, the Individual Defendants knew that there were significant risks to Forterra associated with their continued failure to integrate the Company's acquired businesses, yet they failed to take steps towards successful integration.

74.      On April 5, 2018, the Company filed a Current Report on Form 8-K with the SEC, announcing another spate of unexplained resignations.  According to the Form 8-K, Barner and Wilbeck resigned from the Board on March 31, 2018, followed by Suss, who resigned on April 3, 2018.  The Form 8-K claimed that the "resignations did not result from any disagreement with the Company," but no further information was provided.

75.      Just four days after the resignations were disclosed, the Board elected Richard Cammerer, Jr. ("Cammerer"), Dominic LaValle ("LaValle"),[3] and Chad Lewis ("Lewis") to replace Barner, Wilbeck, and Suss on the Board.  Cammerer and Lewis are employees of Hudson, Forterra's controlling stockholder, and are therefore non-independent directors.

---

[3]  According to a Current Report on Form 8-K filed with the SEC on December 27, 2018, LaValle resigned from the Board on December 21, 2018.  The Form 8-K claimed that the "resignation did not result from any disagreement with the Company," but no further information was provided.

***The Individual Defendants Cause Forterra to Issue a Materially False and Misleading Proxy Statement***

76.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, on April 28, 2017, they also caused the Company to file with the SEC and disseminate to stockholders a definitive proxy statement on Form DEF 14A (the "2017 Proxy") in connection with the Company's Annual Meeting of Stockholders, scheduled for June 19, 2017.  The Individual Defendants drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to Forterra's stockholders.  The Individual Defendants negligently issued materially misleading statements in the 2017 Proxy.[4]

77.     According to the 2017 Proxy, stockholders would be asked to vote on a number of agenda items, including:  (1) the reelection to the Board of defendants Bradley, Corcoran, Barner, and Suss to three-year terms; (2) the approval, on an advisory basis, of the compensation of its named executive officers; and (3) to determine, on an advisory basis, the appropriate frequency with which future advisory votes on executive compensation should occur.

78.     The 2017 Proxy described director responsibilities; the duties of each Board committee; Board risk assessment and management; and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

79.     Specifically, the 2017 Proxy described the Board's risk oversight as follows:

> While management has responsibility for managing risk, our Board of Directors
> has responsibility for overseeing our risk management process.  The Board oversees
> a Company-wide approach to risk management, designed to enhance stockholder

---

[4]   These 2017 Proxy allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2017 Proxy allegations and related claims.

value, support the achievement of strategic objectives and improve long-term organizational performance. The Board determines the appropriate level of risk for the Company generally, assesses the specific risks faced by the Company and reviews the steps taken by management to manage those risks. In connection with this oversight process, the Board receives periodic updates from management on a variety of matters that impact its risk assessment. The Board's involvement in setting the Company's business strategy facilitates these assessments and reviews, culminating in the development of a strategy that reflects both the Board's and management's consensus as to appropriate levels of risk and the appropriate measures to manage those risks. Pursuant to this structure, risk is assessed throughout the enterprise, focusing on risks arising out of various aspects of the Company's strategy and the implementation of that strategy, including financial, legal/compliance, operational/strategic, health and safety, and compensation risks. The Board also considers risk when evaluating proposed transactions and other matters presented to the Board, including acquisitions and financial matters.

While the Board maintains the ultimate oversight responsibility for the risk management process, its committees oversee risk in certain specified areas. In particular, the Audit Committee reviews and discusses the Company's practices with respect to risk assessment and risk management. The Audit Committee also focuses on financial risk, including internal controls, and discusses the Company's risk profile with the Company's independent registered public accounting firm. In addition, the Audit Committee oversees the Company's compliance program with respect to legal and regulatory requirements, including the Company's codes of conduct and policies and procedures for monitoring compliance. The Compensation Committee periodically reviews compensation practices and policies to determine whether they encourage excessive risk taking, including an annual review of management's assessment of the risk associated with the Company's compensation programs covering its employees, including executives, and discusses the concept of risk as it relates to the Company's compensation programs. Finally, the Nominating and Corporate Governance Committee manages risks associated with the independence of directors and Board nominees. Management regularly reports on applicable risks to the relevant committee or the Board, as appropriate, including reports on significant Company projects, with additional review or reporting on risks being conducted as needed or as requested by the Board and its committees.

80.     The 2017 Proxy included the "Report of Audit Committee Ethics," which stated in

relevant part:

1.  Management has primary responsibility for the accuracy and fairness of the Company's consolidated financial statements as well as the processes employed to prepare the financial statements, and the system of internal control over financial reporting.

2.  The Audit Committee represents the Board of Directors in discharging its responsibilities relating to the Company's accounting, financial reporting, financial practices and system of internal controls.  As part of its oversight role, the Audit Committee has reviewed and discussed with Company's management the Company's audited consolidated financial statements included in our 2016 Form 10-K.

3.  The Audit Committee has discussed with the Company's independent registered public accounting firm, Ernst & Young LLP, the overall scope of and plans for its audit.  The Audit Committee has met with Ernst & Young LLP, with and without management present, to discuss the Company's financial reporting processes and system of internal control over financial reporting in addition to those matters required to be discussed in Auditing Standard No. 1301, *Communications with the Audit Committee*, as adopted by the Public Company Accounting Oversight Board, or the PCAOB.

4.  The Audit Committee has received the written disclosures and the letter from Ernst & Young required by applicable requirements of the PCAOB regarding the independent accountant's communications with the Audit Committee concerning independence, and has discussed with Ernst & Young LLP their independence.

5.  Based on the review and discussions referred to in paragraphs (1) through (4) above, the Audit Committee recommended to the Board of Directors and the Board of Directors has approved the inclusion of the audited financial statements in our 2016 Form 10-K.

81.  The 2017 Proxy also included a discussion of executive compensation, stating that base salaries are established in part based on "Company performance" and that annual incentives "were earned based on the achievement of certain company-wide or segment-level financial performance metrics," among other things.  The statements regarding executive compensation were materially false and misleading in that they failed to disclose that the Company's statements about its business, operations, and prospects were materially false and/or misleading, causing the Company's stock price to be artificially inflated, permitting the Individual Defendants to wrongfully benefit from the fraud alleged herein.

82.  Notably, the 2017 Proxy incorporated and asked stockholders to rely on the FY16 Form 10-K in making their voting decisions.  However, by incorporating the false and misleading

FY16 Form 10-K, the 2017 Proxy contained false and misleading information. As a result, the 2017 Proxy solicited Forterra stockholders' votes for director re-election and advisory approval of executive compensation despite the Individual Defendants' failure to disclose, *inter alia*, that: (1) the Company had insufficient internal controls over its accounting and inventory practices; (2) Forterra's pre-IPO acquisitions had not been properly integrated and were in fact sometime operating in competition with one another; (3) the Company's failure to integrate its acquisitions would impede Forterra's ability to generate organic growth; (4) as a result of the foregoing, Forterra's financial statements for 2016 were inaccurate; and (5) as a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

83.     Shortly after the 2017 Proxy was issued, on May 8, 2017, Forterra announced that on May 3, 2017, Scott Leonard, Forterra's Executive Vice President and COO, had resigned from the Company. The Individual Defendants did not provide an explanation for his resignation – which occurred less than five months after his appointment on January 10, 2017 – or file an amended 2017 Proxy providing more information regarding his departure to stockholders prior to their vote.

**The Whistleblower Complaint**

84.     On February 21, 2018, a former employee of Forterra, Raymond Vuoncino ("Vuoncino"), filed a complaint in the United States District Court for the District of New Jersey that included claims under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and SOX in connection with his retaliatory discharge for whistleblowing activities against Forterra (the "Whistleblower Complaint").[5]

---

[5]  Captioned *Vuoncino v. Forterra, Inc., et al.*, No. 18-cv-02437 (Feb. 21, 2018 D.N.J.).

85.     The Whistleblower Complaint lends further credence to the allegations of fraudulent financial reporting practices, especially related to the persistent material weaknesses in internal controls over inventory described herein.  According to Vuoncino, in the months leading up to Forterra's IPO, the Company's senior management openly expressed a "strong desire" to "accelerate and inflate earnings."  ¶ 17.[6]  Specifically, Vuoncino "observed a disturbing push to accelerate/recognize quarterly 'revenues,' which would inflate net earnings, including directions from Bradley and Kerfin after the IPO to book everything possible at quarter ends."

86.     In late November 2016, Vuoncino learned that Forterra intended to make inter-company transfers of inventory from one subsidiary to another, but "rather than lowering the sale price, a $200 per ton 'rebate' would be given to one of the subsidiaries."  On January 4, 2017, Vuoncino personally observed quarter-ending inventory shifting of truckloads of pipe that resulted in certain subsidiaries booking revenue and others recognizing immediate profit.  ¶¶ 47-49.

87.     On January 6, 2017, Vuoncino wrote to McCullough requesting documentation from E&Y regarding the proper way to account for the monthly pipe rebates.  In response, McCullough told Vuoncino "to 'let it go' and that it could 'be used to positively impact performance and bonuses.'"  ¶ 52.

88.     Vuoncino, who previously worked at KPMG and Dow Jones and had "over twenty-five (25) years of experience in corporate finance," reported to Kerfin and was subsequently terminated in retaliation for his whistleblowing activities.  ¶¶ 5, 61, 69.  Vuoncino seeks, *inter alia*, compensatory, consequential, liquidated, and punitive damages from Forterra, Bradley, and Kerfin.

---

[6]  All references to ¶ __ correspond to the Whistleblower Complaint.  Dkt. No. 1.

## DAMAGES TO FORTERRA

89.     As a result of the Individual Defendants' wrongful conduct, Forterra disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Forterra's credibility. Forterra has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

90.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Forterra to multiple lawsuits alleging violations of the federal securities laws.  These lawsuits, which were originally brought in the U.S. District Court for the Eastern District of New York and subsequently consolidated and transferred to this Court, generally allege that Forterra's registration statement failed to disclose, at the time of the IPO that:  (i) organic sales in Forterra's Drainage and Water segments had significantly declined; (ii) Forterra was experiencing increased pricing pressure due to competition and continued softness in its concrete and steel pipe business; (iii) Forterra had been losing business in its important pipe and precast business due in large part to operational problems at its production plants; and (iv) Forterra had undisclosed material weaknesses in its internal controls that prevented it from accurately reporting and forecasting its financial results.[7]  The securities class action seeks tens of millions of dollars in damages.

91.     As a direct and proximate result of the Individual Defendants' actions, Forterra stands to expend millions of dollars in legal fees and payments, in addition to the excessive compensation and benefits that were paid to the Individual Defendants while they were breaching

---

[7]  The consolidated securities action is captioned *In re Forterra, Inc. Securities Litigation*, Case No. 3:18-cv-01957.

their fiduciary duties to the Company.  Specifically, as a result of the Individual Defendants' breaches, Forterra has incurred significant expenses, including, *inter alia*:

    a.    unwarranted distribution of executive compensation and severance payments;

    b.    increased costs resulting from the loss of market capitalization and the Company's damaged reputation in the investment community;

    c.    substantial costs to carry out internal investigations, including legal fees paid to outside counsel; and

    d.    potential damages related to litigation and/or SEC fines resulting from improperly-reported, overstated profits.

92.    Additionally, as a result of the materially misleading 2017 Proxy, defendants Bradley, Corcoran, Barner, and Suss were all elected to new three-year terms as directors.  These Individual Defendants, who caused the damages to the Company described herein, were given renewed power as a result of their false and misleading statements.

93.    Moreover, these actions have irreparably damaged Forterra's corporate image and goodwill.  For at least the foreseeable future, Forterra will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Forterra's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DERIVATIVE AND DEMAND ALLEGATIONS

94.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.    Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

96.     Plaintiff is an owner of Forterra common stock and was an owner of Forterra common stock at all times relevant hereto.

97.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

98.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

99.     At the time of filing, the Board is comprised of defendants Bradley, Corcoran, McDonnough, McPherson, Meyer, and Sarrazin, and non-parties Cammerer, Rafael Colorado ("Colorado"),[8] and Lewis.

100.    A majority of the nine current members of the Board – Meyer, Cammerer, Corcoran, Lewis, and Colorado – are employed by Hudson, which beneficially owns more than seventy percent of Forterra's outstanding common stock and is an affiliate of Lone Star.  Forterra's 2018 Annual Proxy Statement concedes that "directors who . . . are employed by affiliates or related parties of Lone Star" are not independent.  Therefore Meyer, Cammerer, Corcoran, Lewis, and Colorado cannot discharge their fiduciary duties to independently and disinterestedly investigate and prosecute the claims alleged herein.  Furthermore, Bradley, Brown, Corcoran, McDonnough, and Meyer own substantial equity in Lone Star.

101.    Many of the Individual Defendants have interpersonal or business connections that also render them incapable of independently or fairly considering the claims alleged herein.  For

---

[8] Colorado was elected to the Board on September 28, 2018 to fill the vacancy created when Volluz resigned on September 25, 2018.  Colorado is also a director of Hudson and the Company has conceded he is not independent.

example, Meyer and Lewis also serve together on the Foundation Building Materials, Inc. ("FBM") board of directors.  Additionally, McPherson and Meyer previously worked together at McKinsey.

102.    The Company has thus made it clear to stockholders that the Board is conflicted, and its members are not guaranteed to make decisions that were in the best interest of Forterra.

**Demand is Futile as to the Bradley, Corcoran, McDonnough, McPherson, Meyer, and Sarrazin Because They Face a Substantial Likelihood of Liability**

103.    Bradley, Corcoran, McDonnough, McPherson, Meyer, and Sarrazin (the "Demand Defendants") face a substantial likelihood of liability for their individual misconduct.  The Demand Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

104.    Moreover, the Demand Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Demand Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Forterra.

105.    Furthermore, the Demand Defendants were on notice that there were serious allegations of mismanagement and improper accounting and inventory processes at the Company as a result of Vuoncino's complaint and subsequent filing of the Whistleblower Complaint.  Rather

than properly investigating Vuoncino's allegations on behalf of the Company, the Demand Defendants swept the wrongdoing under the rug and allowed the improper behavior to continue without consequence for those involved.  It is clear that the Demand Defendants are not interested in remedying or punishing improper behavior at the Company, and there is no reason to believe that this would be any different if the Demand Defendants were the implicated wrongdoers.

106.    The Demand Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties have resulted in the Demand Defendants facing a substantial likelihood of liability.  If the Demand Defendants were to bring a suit on behalf of Forterra to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Demand Defendants.

**Demand is Futile as to Bradley**

107.    In addition to the fact that Bradley owns a substantial equity interest in Forterra's controlling stockholder Lone Star, Bradley is not disinterested for purposes of demand futility because his principal occupation is CEO of Forterra.  According to the Company's SEC filings, in 2016 and 2017, Bradley received total compensation of $3,140,119 and $2,829,533, respectively. These amounts are material to him.

108.    Bradley is incapable of considering a demand to commence and vigorously prosecute this action because he faces substantial likelihood of liability as he is a named defendant in the securities class action.

**Demand is Futile as to McDonnough**

109.    McDonnough was previously employed by E&Y as a managing partner in its Dallas office – the same office that served as Forterra's audit firm throughout the Relevant Period, and continues to serve as the Company's audit firm, despite the serious questions raised by the ongoing material weaknesses in Forterra's internal controls and persistent, misleading financial statements. McDonnough's ties with the Company's auditor call into question his ability to impartially consider the allegations contained herein.

110.    Furthermore, McDonnough was a member of the Audit Committee, which was responsible for "represent[ing] the Board of Directors in discharging its responsibilities relating to the Company's accounting, financial reporting, financial practices and system of internal controls," and "[a]s part of its oversight role, the Audit Committee . . . reviewed and discussed with Company's management the Company's audited consolidated financial statements included in [Forterra's] 2017 Form 10-K."  McDonnough and the other members of the Audit Committee essentially abrogated their responsibilities and as a result are directly complicit in the alleged wrongdoing.

111.    To properly investigate and prosecute the claims alleged herein, it would be necessary for McDonnough to sue himself and the other Individual Defendants.  This would expose McDonnough and his colleagues to potential civil liability and criminal or SEC sanctions. This is something McDonnough will not do, particularly in light of the fact that McDonnough is also a named defendant in the securities fraud class action.

112.    According to Forterra's 2018 Annual Proxy Statement, McDonnough received $142,688 in director's fees.  His financial reliance on the Company, and specifically on the Board, further calls into question his independence.  Accordingly, demand is futile as to McDonnough.

**Demand is Futile as to McPherson**

113.    In his role as a member of the Compensation Committee, McPherson was responsible for "reviewing and approving corporate goals and objectives relevant to the compensation of [Forterra's] executive officers in light of those goals and objectives, and setting compensation for [those] officers based on those evaluations."  Rather than adhering to their circumscribed duties, McPherson and the other members of the Compensation Committee mischaracterized Brown's termination as a "resignation for good reason" to grant him an estimated $1 million in severance payments instead of forcing him to indemnify Forterra for his wrongdoing at the Company.  McPherson is directly complicit in, and potentially liable for, the misconduct alleged herein, and he would not be disinterested in the outcome of an investigation into these claims.

114.    Furthermore, according to Forterra's 2018 Annual Proxy Statement, McPherson received $138,014 in director's fees.  His financial reliance on the Company, and specifically on the Board, further calls into question his independence.   Accordingly, demand is futile as to McPherson.

**Demand is Futile as to Meyer**

115.    In his role as the Chair of the Compensation Committee, Meyer was responsible for, "reviewing and approving corporate goals and objectives relevant to the compensation of [Forterra's] executive officers in light of those goals and objectives, and setting compensation for [those] officers based on those evaluations."  Rather than adhering to their circumscribed duties, Meyer, and the other members of the Compensation Committee under his direction, mischaracterized Brown's termination as a "resignation for good reason" so as to grant him an estimated $1 million in severance payments rather than forcing him to indemnify Forterra for his wrongdoing at the Company.  Meyer is directly complicit in, and potentially liable for, the

misconduct alleged herein, and he would not be disinterested in the outcome of an investigation into these claims.

**Additional Demand Futility Allegations**

116.     As demonstrated by the many financial reports the Individual Defendants caused Forterra to file during the Relevant Period, the Individual Defendants were aware that there were significant, persisting material weaknesses in the Company's internal controls.  However, when Vuoncino presented Bradley and Kerfin with his concerns, his employment was terminated.  The Individual Defendants were put on notice of this problem when Vuoncino filed a complaint with the U.S. Department of Labor in June 6, 2017.  The Board decided not to investigate, disclose, or report Vuoncino's claims.   Instead, Vuoncino was forced to file the federal Whistleblower Complaint.  As a result, the Company faces the possibility of a costly settlement or a fine, in addition to the costs of litigating the action in federal court.   The Board's handling of the Whistleblower Complaint is indicative of its members' desire to protect the interests of colleagues rather than acting in the best interest of the Company and its stockholders.

117.     The Board also illustrated its inclination to favor the interests of Company insiders over those of Forterra when its members elected to deem Brown's resignation "for good reason," thereby granting him a significant severance payment at the expense of the Company, which could have reasonably pursued remedies against Brown.

118.     Furthermore, if Forterra's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their own protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action

brought directly by Forterra against the Individual Defendants, known as the "insured versus insured exclusion."

119.    As a result, if the Demand Defendants were to sue themselves or certain officers of Forterra, there would be no D&O Insurance protection.  This is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Demand Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Forterra by prosecuting this action.

120.    The Board has proven time and time again that it is incapable of exercising independent judgment in deciding whether to investigate or bring actions that involve its individual members.  There is no reason to believe that this action would be any different.  Each of the Individual Defendants either participated directly in the wrongdoing alleged or are inextricably linked to defendants who so participated.  For all of the aforementioned reasons, demand on the Board is futile and thus excused.

## COUNT I

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against the Individual Defendants)

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege

and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

123.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

124.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

125.    The 2017 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Forterra stockholders' votes for, *inter alia*, director re-election and advisory approval of executive compensation, while simultaneously misrepresenting and/or failing to disclose the Company's failure to integrate its acquired businesses, its improper accounting practices, and its insufficient internal controls over financial reporting.

126.    As alleged herein, the Individual Defendants negligently issued, caused the Company to issue, and participated in the issuance of  untrue statements of material facts and omit

material facts necessary to make the issued statements not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

127.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2017 Proxy were materially false and misleading.

128.    The omissions and false and misleading statements in the 2017 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to stockholders.

129.    As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant Forterra suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duties

130.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

131.    The Individual Defendants each owed Forterra and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.  The Individual Defendants violated these fiduciary duties – they have engaged in unlawful self-dealing and have acted to put their personal interests and/or their related entities' and business partners' interests ahead of the interests of Forterra and its stockholders.

132.     As described herein, the Individual Defendants failed to disclose material information and/or made material misrepresentations to stockholders regarding Forterra's falsified financial reporting during the Relevant Period.

133.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Forterra and its public stockholders.

134.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, in concert with the other defendants, Forterra has sustained, and continues to sustain, significant damages.

## COUNT III

### Against the Individual Defendants
### For Constructive Fraud

135.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.     As corporate fiduciaries, the Individual Defendants owed Forterra and its stockholders a duty of candor and accurate disclosure regarding the true state of Forterra's business and assets and their conduct with regard thereto.

137.     As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Forterra's stockholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Forterra.  Thus, they have committed constructive fraud and violated their duty of candor.

138.     Forterra has been damaged by the Individual Defendants' violations of their duties of candor and constructive fraud.

## COUNT IV

### Against the Individual Defendants
### For Corporate Waste

139.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

140.    The Individual Defendants have caused Forterra to waste its valuable corporate assets in the following ways:  (i) failing to consider the interests of the Company and its public stockholders; (ii) failing to conduct proper supervision; (iii) needlessly paying more than $1 million to Brown as a severance payment; and (iv) failing to seek indemnity from Brown or any other Officer Defendant for the harm they caused Forterra.

141.    As a result of the Individual Defendants' corporate waste, they are liable to the Company.

## COUNT V

### Against the Officer Defendants
### For Unjust Enrichment

142.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

143.    By their wrongful acts and false and misleading statements and omissions of material fact, the Officer Defendants were unjustly enriched at the expense of Forterra through the cash bonuses they received for "achieving" financial goals which were illusory and only a result of improperly overstated financial figures.  The Officer Defendants were not held liable for their misconduct at Forterra – conduct that has exposed the Company to tens of millions of dollars in potential liability.  The Officer Defendants should disgorge the profits they have and/or will otherwise unjustly obtain at the expense of Forterra.

144.    In addition, Brown received a severance payment in excess of $1 million that was neither earned nor justified.  Brown's severance payment was undoubtedly part of a scheme to cover up the Individual Defendants' complicity in the wrongful conduct described herein.

145.    The cash bonuses and Brown's severance payments distributed to the Officer Defendants were granted at the expense of Forterra.  The Company received no benefit from these payments and Forterra was seriously damaged by the payments.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Forterra and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding money damages against all defendants, jointly and severally, for the losses and damages suffered as a result of the acts and transactions complained of herein;

C.    Directing all defendants to disgorge all profits obtained from their wrongful conduct and breaches of fiduciary duties, including all severance payments and payments of cash bonuses;

D.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses;

F.    Awarding pre-judgment and post-judgement interest against the Individual Defendants at the highest rates permissible at law or in equity; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  January 15, 2019

**RIGRODSKY & LONG, P.A.**

By:  */s/ Brian D. Long*

**OF COUNSEL:**

Brian D. Long (#4347)
Gina M. Serra (#5387)

**BRAGAR EAGEL & SQUIRE, P.C.**

300 Delaware Avenue, Suite 1220

Marion C. Passmore
Melissa A. Fortunato
Shaelyn Gambino-Morrison
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: (212) 308-5858
Email:  passmore@bespc.com
fortunato@bespc.com
Gambino-
morrison@bespc.com

Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email:gms@rl-legal.com

*Attorneys for Plaintiff*